IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | |
|---|---|
| **APPALACHIAN VOICES and SIERRA CLUB,**<br>*Plaintiffs,*<br><br>**v.**<br><br>**TENNESSEE VALLEY AUTHORITY,**<br><br>*Defendants.* | **Civil Case No.** 3:26-cv-00464 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Appalachian Voices and the Sierra Club (collectively, "Plaintiffs") hereby file this Complaint for declaratory and injunctive relief against Defendant Tennessee Valley Authority ("TVA") and state the following:

## I. INTRODUCTION

1. TVA's Kingston Coal Plant sits along the Clinch River in Roane County, Tennessee. The Plant is less than forty miles from Great Smoky Mountains National Park, the most visited National Park in the country.

2. When it began operating in 1955, the Kingston Coal Plant was the largest coal-fired power plant worldwide, burning a two-mile-long train's worth of coal every day.

3. In 2024, TVA decided it would retire the seventy-year-old Kingston Coal Plant by the end of 2027 and build a new gas plant elsewhere on the 2,254-acre Kingston Reservation. TVA represented that constructing and operating the new gas plant ("Kingston Gas Plant") would not cause a significant increase in emissions of air pollutants because the Coal Plant would retire by the end of 2027.

4. TVA's coal-fired power plants have a record of harm in the region, emitting substantial amounts of air pollutants that are known to cause adverse health effects.

5. The Kingston Coal Plant's impacts on the local community and surrounding environment are as old as the plant itself. One year after the Coal Plant's construction was completed, one of Tennessee's U.S. Senators introduced legislation "designed to eliminate the air-pollution problem in Kingston, Tenn." from TVA's coal plant. *See* S. 3020, 84th Cong. (1956).

6. In 2008, the Kingston Coal Plant gained national infamy when approximately 5.4 million cubic yards of toxic coal ash slurry broke through its retaining wall, smothering the surrounding land and water.

7. Community members living in the shadow of the smokestacks have long advocated for TVA to retire the Kingston Coal Plant because of its harmful pollution. Those communities celebrated when TVA decided to retire all nine coal-fired boilers at the Kingston Coal Plant by the end of 2027.

8. TVA announced its plan to build the Kingston Gas Plant when the agency finalized its decision to retire the Kingston Coal Plant. The Kingston Gas Plant consists of one new methane gas-fired combined-cycle electric generating unit, sixteen gas- and oil-fired simple-cycle aeroderivative combustion turbines, one new gas-fired boiler, five new gas-fired fuel heaters, and other ancillary equipment.

9. TVA proposed a tradeoff. In exchange for its promise to substantially reduce total emissions of air pollutants from facilities located on the Kingston Reservation by retiring the entire Coal Plant by the end of 2027, TVA sought to classify the new Gas Plant as a "minor" modification of the retiring Coal Plant.

10. The Technical Secretary of Tennessee's Air Pollution Control Board relied on TVA's assertion that it could subtract the Coal Plant's historical emissions from the Gas Plant's potential emissions to grant a permit for construction of the Kingston Gas Plant under Tennessee's minor New Source Review regulations. Based on TVA's promise to permanently close the Coal Plant, the state agency authorized TVA to construct and operate the Gas Plant without complying with the heightened air quality protections and public participation requirements that apply to new major stationary sources and major modifications under the Clean Air Act.

11. The minor New Source Review permit issued by the Technical Secretary of Tennessee's Air Pollution Control Board authorized TVA's construction of the Kingston Gas Plant as a minor modification of the Kingston Coal Plant, conditional on the permanent retirement of all nine coal-fired boilers upon operation of the new combustion turbines, no later than December 31, 2027.

12. When TVA decided in 2024 to retire the Kingston Coal Plant, it explained that the Plant was old and unreliable. TVA also enumerated the various risks associated with the continued operation of the Kingston Coal Plant.

13. But in February 2026, as construction of the Kingston Gas Plant was well underway, TVA announced it would continue operating the aging Kingston Coal Plant beyond the 2027 retirement date and alongside the new Gas Plant.

14. TVA's unilateral decision to change course rendered its minor modification air permit for the Gas Plant invalid. It nullified the factual premise the state permitting agency had expressly relied upon—that the Gas Plant's emissions would be largely offset by the substantial reduction in emissions that would result from shutting down the Coal Plant.

15. If construction of the Gas Plant is a modification of the Coal Plant that is no longer retiring, the increased emissions associated with operating the Gas Plant alongside the Coal Plant are significant enough that they require review under the Clean Air Act's Prevention of Significant Deterioration ("PSD") program as a "major modification" of an existing major stationary source of air pollution. If the Gas Plant and Coal Plant are separate sources, the Gas Plant's emissions are also significant enough to require PSD review as a new major stationary source. Either way, construction of the new Gas Plant requires a PSD permit.

16. The Kingston Gas and Coal Plants together have the potential to emit thousands of tons per year of harmful pollutants such as particulate matter, sulfur dioxide, nitrogen oxides, and smog-forming volatile organic compounds, all of which are tied to adverse health effects.

17. TVA has acknowledged that its decision to continue operating the Kingston Coal Plant beyond 2027 and alongside the new Gas Plant requires a PSD permit. Yet TVA did not pause its ongoing construction of the Gas Plant without the requisite PSD permit, nor has TVA applied for the required PSD permit.

18. By failing to undergo the appropriate preconstruction review for the Gas Plant as a new major source or major modification, TVA avoided evaluating and applying emission limits that reflect the maximum degree of emissions reduction achievable using up-to-date pollution control technologies and processes, known as the best available control technology ("BACT"). The now-invalid minor modification permit that TVA obtained as a tradeoff for retiring the Coal Plant does not impose such emission limits.

19. By failing to undergo the appropriate preconstruction review for the Gas Plant as a new major source or major modification, TVA also avoided performing preconstruction air quality monitoring and air dispersion modeling to evaluate whether its increased emissions could cause or

contribute to air pollution in excess of any national ambient air quality standards or otherwise significantly degrade air quality. TVA's plan to operate the new Kingston Gas Plant alongside the aging Coal Plant thus poses a risk of exposing nearby residents to levels of air pollution that exceed federal health-based standards.

20. Had TVA applied for and obtained a PSD permit before beginning construction of the new Gas Plant, the Tennessee Department of Environment and Conservation ("TDEC") would have been required to provide a meaningful opportunity for the public to participate in the permitting process before TVA's proposed design was approved and constructed. Instead, TDEC only accepted public comments on TVA's minor New Source Review permit application and provided no opportunity for public review or input on the agency's analysis or proposed permit conditions.

21. After the gas turbines were purchased and as construction was well underway, TVA unilaterally decided to put the communities surrounding the Kingston Reservation at risk of exposure to significant increases in harmful air pollution from the operation of both plants without providing any opportunity for meaningful public review and input. These communities will bear the brunt of adverse health effects, increased healthcare costs, and diminished enjoyment of outdoor activities due to their concerns about being exposed to increased air pollution. The PSD permitting process, which TVA bypassed, is designed to prevent and control such harmful levels of pollution.

22. TVA has estimated that continuing to operate the Kingston Coal Plant beyond 2027 will require an investment of hundreds of millions of dollars in life-extending renovations, yet TVA has not applied for an air permit to authorize these modifications.

23. To protect the health and welfare of their members who live, work, and/or recreate in areas that will be impacted by air pollution emitted from the Kingston Gas and Coal Plants, Appalachian Voices and the Sierra Club seek declaratory and injunctive relief to rectify TVA's violations of federal and state law.

24. Specifically, Plaintiffs seek (1) a declaratory judgment that TVA violated and continues to violate the Clean Air Act and Tennessee's federally enforceable State Implementation Plan; (2) an injunction ordering TVA to halt its ongoing construction of new emission units at the Kingston Gas Plant until it completes the required preconstruction monitoring, source impact analysis, and BACT analyses and obtains a final PSD permit with enforceable BACT emission limits reflective of the maximum emissions reductions achievable; and (3) an order requiring TVA to pay appropriate civil penalties for each day of violation, as well as Plaintiffs' costs of litigation including reasonable attorney and expert witness fees.

25. Absent such declaratory and injunctive relief from this Court, TVA will continue to construct a facility that will cause a significant increase in emissions of harmful air pollutants in violation of federal and state law as described in this Complaint, which will continue to harm the health and welfare of members of Appalachian Voices and the Sierra Club.

## II. JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

27. On July 20, 2026, in accordance with 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. pt. 54, Plaintiffs' counsel provided notice of the violations alleged in this Complaint by sending a letter via certified mail to Defendant TVA, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator for EPA Region 4, the Acting Attorney General of the United States, the Technical Secretary of the Tennessee Air Pollution Control Board, TDEC,

and the Governor of the State of Tennessee. A copy of the notice letter is attached hereto as **Exhibit A**. *See* **Ex. A**, Letter from Caroline Cress et al., S. Env't L. Ctr., to Mike Skaggs, Tenn. Valley Auth. et al. (July 20, 2026).

28. More than sixty days have passed since Plaintiffs' counsel served notice of the violations alleged in this Complaint on July 20, 2026. *See* 42 U.S.C. § 7604(b)(1)(A).

29. Neither the EPA Administrator nor the State of Tennessee has commenced or is diligently prosecuting any civil action in federal or state court to require compliance with any emission standard or limitation that this Complaint alleges TVA violated or is violating. *See* 42 U.S.C. § 7604(b)(1)(B).

30. This Court has jurisdiction to grant the requested declaratory and injunctive relief, apply any appropriate civil penalties, and award costs of litigation (including reasonable attorney and expert witness fees) to Plaintiffs. 42 U.S.C. § 7604(a), (d); 28 U.S.C. §§ 2201(a), 2202, 1355(a).

31. Venue is proper in the U.S. District Court for the Eastern District of Tennessee because the Kingston Fossil Plant, the stationary source at which the violations alleged herein have occurred and are occurring, is located within this judicial district. 42 U.S.C. § 7604(c)(1); 28 U.S.C. § 1391(b)(2).

## III. PARTIES

### A. Plaintiffs

32. Plaintiffs Appalachian Voices and Sierra Club are non-profit organizations with members who live, work, and/or recreate in areas impacted by emissions from pollutant-emitting activities on the Kingston Reservation and who are and/or will be adversely impacted by being exposed to the increased air pollution resulting from the continued operation of the Coal Plant and the construction and operation of the Gas Plant.

33. Plaintiff Appalachian Voices is a grassroots non-profit organization dedicated to bringing people together to protect the land, air, and water of Central and Southern Appalachia and to advance a just transition to a generative and equitable clean-energy economy. Appalachian Voices works collaboratively with local, state, and regional partners to promote energy efficiency and encourage the development of clean and affordable energy. For example, Appalachian Voices meets with TVA and TVA-area distribution utilities to advocate for clean energy and supports communities across the region to help them organize and plan advocacy campaigns related to the energy choices of TVA and distribution utilities.

34. Clean air is of paramount importance to the health and well-being of the members of Appalachian Voices, and it has an established history of clean air advocacy across Tennessee, including citizen air quality monitoring.

35. Appalachian Voices is headquartered in Boone, North Carolina, and has additional offices in Knoxville, Tennessee; Charleston, West Virginia; and Charlottesville and Norton, Virginia.

36. Appalachian Voices has more than 100 members who reside in Tennessee.

37. Appalachian Voices is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

38. Plaintiff Sierra Club is a national non-profit organization, with nearly 600,000 members nationwide, that is dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

39. Clean air is of paramount importance to the health and well-being of the members of the Sierra Club, and it has an established history of clean air advocacy across Tennessee.

40. The Sierra Club is headquartered in Oakland, California, and has Chapters throughout the country.

41. The Sierra Club has more than 7,000 members who reside in Tennessee.

42. The Sierra Club is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

43. Appalachian Voices and the Sierra Club are dedicated to protecting healthy ambient air quality for all Tennesseans.

44. Appalachian Voices and the Sierra Club each have members who are exposed or face the threat of exposure to air pollution from the Kingston Coal and Gas Plants because they live, work, and/or recreate in areas impacted by emissions from these facilities. These members are concerned about the effects of the emissions of both Plants on their health and their families' health and their ability to enjoy spending time outdoors at their homes and at parks and other recreational sites near the Plants and across Tennessee.

45. Since learning about TVA's decision to continue operating the Kingston Coal Plant beyond 2027 and alongside the new Gas Plant, members of Appalachian Voices and the Sierra Club have grown concerned about the impacts of the combined operation of both Plants at the site, particularly when spending time outside.

46. For example, Appalachian Voices Member A lives less than five miles north of the Kingston Reservation, where she has lived for most of her life. She spends time outside nearly every day, often for hours at a time, working on the garden and elsewhere on their one-acre property in Harriman, Tennessee.

47. This Appalachian Voices member is concerned about air pollution from the Kingston Coal Plant. She can see the plant's smokestacks from her house. She wears a mask when working outdoors, because otherwise it is difficult for her to breathe.

48. This Appalachian Voices member is also concerned about what additional pollution will be caused by the new Kingston Gas Plant under construction. Both plants operating together make her air quality concerns, and potentially her difficulty breathing, even worse.

49. This Appalachian Voices member is also aware of impacts from air pollution on haze in the region. She has a view of Walden's Ridge out her front window that is occasionally obscured by haze, making it more difficult to enjoy the view. This Appalachian Voices member wants to be able to breathe the cleanest air possible, and TVA's continued operation of the Kingston Coal Plant in addition to the new Kingston Gas Plant is likely to diminish that enjoyment.

50. Sierra Club Member A, who is also a member of Appalachian Voices, lives in Harriman, less than three miles northeast of the Kingston Reservation. This member enjoys taking regular walks with her husband and their dog in Lakeshore Park, which is less than two miles north of the Kingston Reservation. She is aware of, and concerned about, the air pollution emitted from the Kingston Coal Plant, and she is worried the addition of the Kingston Gas Plant will make air pollution worse.

51. Sierra Club Member A coordinates a weekly local outdoor farmers' market with her husband through their church in Kingston, which is approximately two miles from the Kingston Reservation. This member is concerned that spending time outside, whether taking walks or spending time at the farmers' market, is bad for her health. She is worried that when the new Kingston Gas Plant begins operating in conjunction with the Coal Plant, she will have to wear a mask outside or replace outdoor exercise with indoor exercise.

52. Sierra Club Member A has participated previously in public comment opportunities regarding activities at the Kingston Reservation. It is important to this member that she remain informed about what decisions at the site will mean for local air quality. She is concerned that unhealthy air quality from uncontrolled emissions at the Kingston Reservation would adversely affect her and her husband.

**B. Defendants**

53. Defendant TVA is a public utility and corporate agency of the United States.

54. TVA maintains physical headquarters at 400 West Summit Hill Drive in Knoxville, Tennessee, and at 1101 Market Street in Chattanooga, Tennessee.

55. TVA is the owner of the 2,254-acre property known as the Kingston Reservation, located at 714 Swan Pond Road, Harriman, Roane County, Tennessee 37748.

56. TVA is the owner and operator of the Kingston Coal Plant and the Kingston Gas Plant, which are both located at the Kingston Reservation, 714 Swan Pond Road, Harriman, Roane County, Tennessee 37748.

57. TVA is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a)(1), (a)(3).

58. TVA is a "department, agency, [or] instrumentality" of the federal government within the meaning of the Clean Air Act's waiver of sovereign immunity under 42 U.S.C. § 7418(a).

59. Under the Tennessee Valley Authority Act of 1933, TVA "[m]ay sue and be sued in its corporate name." 16 U.S.C. § 831c(b).

60. At all times relevant to the violations alleged in this Complaint, TVA has controlled the operation of the Kingston Coal Plant and the construction of the Kingston Gas Plant.

## IV. STATUTORY FRAMEWORK

61. The Clean Air Act is a broad remedial statute that Congress enacted to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).

62. The Clean Air Act requires EPA to establish regulatory requirements for emissions of certain air pollutants, referred to as "criteria pollutants," which "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7408, 7409. Emissions of many other pollutants not designated as "criteria pollutants" are also regulated under the Clean Air Act. *See, e.g.*, 42 U.S.C. § 7412; 40 C.F.R. § 51.166(b)(23), (b)(49).

63. "Criteria pollutants" include nitrogen oxides ("$NO_X$"), particulate matter with a diameter of 10 microns or less ("$PM_{10}$"), particulate matter with a diameter of 2.5 microns or less ("$PM_{2.5}$"), carbon monoxide ("CO"), sulfur dioxide ("$SO_2$"), ozone, and lead. 40 C.F.R. §§ 50.4–.21.

64. EPA must establish allowable concentrations of criteria pollutants in the outdoor air, known as National Ambient Air Quality Standards ("NAAQS"). "Primary" NAAQS must be set at levels "requisite to protect the public health," while "allowing an adequate margin of safety." 42 U.S.C. § 7409(b)(1).

65. Most primary NAAQS are designated as annual not-to-exceed levels, hourly or daily not-to-exceed levels, or both. *See* 40 C.F.R. §§ 50.4 ($SO_2$), 50.6 ($PM_{10}$), 50.7 ($PM_{2.5}$), 50.8 (CO), 50.9–.10 (ozone), 50.11 ($NO_X$).

66. EPA must review and, as appropriate, revise the NAAQS every five years. 42 U.S.C. § 7409(d)(1). Within two years of adopting a new or revised NAAQS, EPA must promulgate "designations" identifying all areas of the country as either meeting or violating the new or revised standard. *Id.* § 7407(d)(1)(B)(i).

67. EPA designates an area as "nonattainment" if the area does not meet the applicable standard or "contributes to ambient air quality in a nearby area that does not meet" the standard. 42 U.S.C. § 7407(d)(1)(A)(i). EPA designates an area as "attainment" if the area meets the standard and does not contribute to a violation of the standard in a nearby area. *Id.* § 7407(d)(1)(A)(ii). An "unclassifiable" area is "any area that cannot be classified on the basis of available information as meeting or not meeting" the standard and is treated for regulatory purposes as an attainment area. *Id.* §§ 7407(d)(1)(A)(iii), 7471.

68. Each State must develop a State Implementation Plan ("SIP") setting forth how the NAAQS will be achieved and maintained within the state.

69. SIPs must be submitted to and approved by EPA pursuant to statutory criteria and a public process. 42 U.S.C. § 7407(a).

70. Through SIPs, state agencies are responsible for ensuring compliance with federal air quality standards. 42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(6).

71. Once approved by EPA, the provisions of a SIP are federally enforceable by EPA and members of the public under the Clean Air Act's citizen suit provision. *See* 42 U.S.C. §§ 7413, 7604.

72. The provisions that EPA has approved and incorporated into Tennessee's SIP are identified in 40 C.F.R. § 52.2220.

**A. New Source Review and Prevention of Significant Deterioration Programs**

73. Congress amended the Clean Air Act in 1977 to create the New Source Review program, which establishes minimum requirements for the regulation of new and modified stationary sources of air pollution. The central premise of New Source Review is that no owner or operator can build or expand a major source of air pollution before evaluating the proposed source's potential impacts on ambient air quality (by gathering preconstruction air monitoring data

and performing air dispersion modeling), evaluating and implementing up-to-date pollution control technologies to reduce emissions to the maximum degree achievable, and obtaining a preconstruction permit with enforceable conditions that prevent the proposed source from causing or contributing to air pollution in excess of any national ambient air quality standard or otherwise significantly deteriorating air quality. 42 U.S.C. §§ 7470–7492.

74. The Clean Air Act and its implementing regulations include two programs governing major new sources and major modifications of existing major sources, which, together, are referred to as major New Source Review: the Prevention of Significant Deterioration ("PSD") program, which applies to increases in emissions of pollutants for which an area is designated as "attainment" or "unclassifiable" for the applicable NAAQS; and the Nonattainment New Source Review program, which applies to increases in emissions of pollutants for which an area is designated "nonattainment" for the applicable NAAQS. 42 U.S.C. §§ 7470–7492.

**1. New major sources and modifications of existing major sources that cause a significant net emissions increase must comply with major New Source Review requirements.**

75. The Clean Air Act requires that SIPs include a PSD program requiring preconstruction analyses and rigorous permitting requirements for new major stationary sources and major modifications at existing major sources. 42 U.S.C. §§ 7410(a)(2)(D)(i)(II), 7475(a).

76. Two key purposes of the PSD program are to "protect public health and welfare from any actual or potential adverse effect" of air pollution and to assure that "any decision to permit increased air pollution" in an area designated as attainment "is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision-making process." 42 U.S.C. § 7470(1), (5).

77. Under the Clean Air Act, a PSD permit must be issued before an owner or operator may begin construction of any "major emitting facility," including a "major modification" to an "existing major stationary source." 42 U.S.C. § 7475(a)(1); 40 C.F.R. § 51.166(a)(7)(ii)–(iii).

78. A fossil fuel-fired steam electric plant with a heat input capacity of more than 250 million British thermal units per hour ("MMBtu/hr") is a major stationary source if it emits or has the potential to emit at least 100 tons per year of any pollutant subject to the PSD program. 40 C.F.R. § 51.166(b)(1)(i)(A).

79. A major modification is a "physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase [of a regulated pollutant] and a significant net emissions increase of that pollutant from the major stationary source." *Id.* § 51.166(b)(2)(i).

80. Determining whether a proposed change at an existing major source will be a "major modification" requiring a PSD permit is a two-step process. At Step One, the analysis focuses on whether the "project" alone would result in a "significant emissions increase" of a regulated pollutant. 42 U.S.C. § 7411(a)(4); 40 C.F.R. § 51.166(a)(7)(iv)(A), (b)(2)(i).

81. An "increase" caused by a physical change to the existing source occurs "when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant." 40 C.F.R. § 51.166(b)(3)(vii).

82. An emissions increase of a regulated pollutant is considered "significant" for this purpose if it equals or exceeds a certain *de minimis* level for that pollutant, specified by federal regulation, in tons per year. *Id.* § 51.166(b)(23)(i).

83. If a project will cause a "significant emissions increase" of a regulated pollutant, then the analysis turns to Step Two: whether the change would result in a "significant *net* emissions increase" of that pollutant. *Id.* § 51.166(a)(7)(iv)(A) (emphasis added).

84. A "net emissions increase" of a regulated pollutant is calculated by combining the amount of emissions increased by the project with all source-wide changes in emissions (increases and decreases) that are "contemporaneous with the particular change" and meet other requirements. *Id.* § 51.166(b)(3)(i). A "contemporaneous" increase or decrease is one that occurs "within a reasonable period (to be specified by the state) before the date that the increase from the particular change occurs." *Id.* § 51.166(b)(3)(ii).

**2. PSD requirements apply to significant increases in emissions of certain regulated pollutants.**

85. Pollutants regulated under the PSD program include any pollutant for which EPA has promulgated NAAQS. 40 C.F.R. § 51.166(b)(49)(i). Other pollutants regulated under the PSD program include volatile organic compounds ("VOC"), sulfuric acid mist ("$H_2SO_4$"), hydrogen sulfide, fluorides, and greenhouse gases in the form of carbon dioxide equivalents ("$CO_2e$"). *Id.* § 51.166(b)(23)(i), (b)(48)–(49).

86. A project that will cause a net increase of forty tons per year or more of VOC must be permitted as a major modification for ozone. *Id.* § 51.166(b)(23)(i).

87. $NO_X$ is regulated as criteria pollutant and as a precursor to ozone. A project that will cause a net emissions increase of forty tons per year or more of $NO_X$ must be permitted as a major modification for $NO_X$ and for ozone. *Id.* Such a project must also be permitted as a major modification for $PM_{2.5}$ unless the State demonstrates that NOx emissions do not significantly contribute to the area's ambient levels of $PM_{2.5}$. *Id.* § 51.166(b)(23)(i), (b)(49)(B)(3).

88. A project that will cause a net increase of twenty-five tons per year or more of particulate matter ("PM") must be permitted as a major modification for PM. *Id.* § 51.166(b)(23)(i).

89. A project that will cause a net increase of fifteen tons per year or more of $PM_{10}$ must be permitted as a major modification for $PM_{10}$. *Id.*

90. A project that will cause a net increase of ten tons or more per year of direct $PM_{2.5}$ must be permitted as a major modification for $PM_{2.5}$. *Id.*

91. A project that will cause a net increase of forty tons per year or more of $SO_2$ must be permitted as a major modification for $SO_2$ and for $PM_{2.5}$. *Id.*

92. A project that will cause a net increase of 100 tons per year or more of CO must be permitted as a major modification for CO. 40 C.F.R. *Id.*

93. A project that will cause a net increase of 75,000 tons per year or more of $CO_2e$ must be permitted as a major modification for greenhouse gases (the aggregate group of carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride) if the project will also cause a significant emissions increase of another pollutant subject to PSD. *Id.* § 51.166(b)(48)(iv)(B).

**3. New major sources and major modifications to existing major sources in attainment areas must comply with emissions limitations reflecting the best available control technology.**

94. Permits for new major sources and "major modifications" must impose emission limitations referred to as best available control technology, or BACT limits, for each pollutant subject to PSD review.

95. The Clean Air Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant . . . which the permitting authority, on a case-by-case basis,

taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility." 42 U.S.C. § 7479(3); *see* 40 C.F.R. § 51.166(b)(12).

96. The Clean Air Act defines an "emission limitation" as a requirement that "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice, or operational standard." 42 U.S.C. § 7602(k).

97. The application of BACT limits is required for "each proposed emissions unit at which a net emissions increase in the pollutant would occur." 40 C.F.R. § 51.166(j)(3).

98. Federal rules prohibit the circumvention of PSD review by proposing or accepting enforceable emissions limits to remain below applicable PSD thresholds and subsequently relaxing those limits. *Id.* § 51.166(r)(2). This includes, for example, a restriction on hours of operation that reduces a project's net emissions increase(s) to be below the applicable threshold(s) for a major modification but is later removed from the permit. *Id.* In such cases, PSD requirements apply upon relaxation of the limit "as though construction had not yet commenced on the source or modification." *Id.*

**4. New major sources and major modifications to existing major sources in attainment areas must conduct specific analyses and allow for public input before beginning actual construction.**

99. The proponent of a new major source or major modification must perform a "source impact analysis" to demonstrate that construction and operation of the new or modified source "would not cause or contribute to" an exceedance of any ambient air quality standard or otherwise significantly deteriorate ambient air quality. 42 U.S.C. § 7475(a)(3)(B), (e)(1), (e)(3)(B); 40 C.F.R. § 51.166(k), (m).

100. The preconstruction source impact analysis must take into account existing pollution levels based on "continuous air quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the [NAAQS]." 40 C.F.R. § 51.166(m)(1)(iii).

101. If the source impact analysis demonstrates the project will cause or contribute to a NAAQS exceedance, then the permittee must revise its project as needed to ensure NAAQS compliance, or the permitting agency must deny the application. *Id.* § 51.166(k).

102. The PSD preconstruction review process also includes an assessment of visibility impacts on nearby national parks, wilderness areas, and other specially designated places, collectively referred to as Class I areas. 42 U.S.C. § 7475(d)(2).

103. This assessment of potential visibility impacts must be subject to consultation with federal agencies responsible for managing and protecting Class I areas. If a federal agency finds that the project's emissions will cause an "adverse impact" on visibility in such an area, the project cannot be permitted. *Id.* § 7475(d)(2)(C)(ii).

104. Permitting agencies must ensure that proposed projects undergo these required air quality analyses as part of the preconstruction review, following processes, methodological standards, and guidelines for analysis set at the federal level for each pollutant subject to PSD review. 40 C.F.R. § 51.166(*l*)–(m).

105. The Clean Air Act also requires that states provide "adequate procedural opportunities for informed public participation in the decision making process" for all sources subject to PSD review. 42 U.S.C. § 7470(5). The Act prohibits construction of new major sources and major modifications absent "a public hearing" hosted by the permitting authority "with opportunity for interested persons . . . to appear and submit written or oral presentations on the air

quality impact of [the new] source, alternatives thereto, control technology requirements, and other appropriate considerations." *Id.* § 7475(a)(2).

**B. Tennessee SIP Requirements for Preconstruction and Operating Permits for New Major Sources and Major Modifications**

106. Tennessee's federally approved SIP prohibits construction of any new major stationary source or major modification "unless the requirements of [Tennessee's PSD regulations] have been met." Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1.

107. Tennessee's federally approved SIP prohibits construction of any new major stationary source or major modification "without a permit that states that the major stationary source or major modification will meet [the] requirements" of Tennessee's PSD regulations. *Id.* at 1200-03-09-.01(4)(c)3.

108. Tennessee's PSD regulations apply to new major stationary sources and major modifications. *Id.* at 1200-03-09-.01(4)(a)1. Other new and modified sources must still apply for and receive a minor New Source Review permit before beginning construction of "a new air contaminant source or the modification of an air contaminant source which may result in the discharge of air contaminants." *Id.* at 1200-03-09-.01(1)(a) (2013).

109. The obligation to obtain an appropriate permit is ongoing and applies even to those sources that began construction before obtaining the appropriate permit. *Id.* at 1200-03-09-.01(1)(e); *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410, 419 (6th Cir. 2007).

110. The regulatory requirements for minor sources and minor modifications under Tennessee's minor New Source Review program are less stringent than those for major modifications and new major sources. *See* Tenn. Comp. R. & Regs. 1200-03-02-.01(aa)4. (1993), 1200-03-09-.01(4)(a)2.

111. The Tennessee SIP's definition of "major modification" and two-step assessment of whether a "physical change in or change in method of operation of" an existing source constitutes a "major modification" for purposes of PSD permitting mirrors the federal process. *Id.* at 1200-03-09-.01(4)(b)2., (4)(b)4., (4)(b)49.; *see supra* ¶¶ 80–84.

112. In Tennessee, a "contemporaneous" increase or decrease is one that "occurs between . . . [t]he date five years before a completed application for the particular change is submitted" and "[t]he date that the increase from the particular change occurs." Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(b)4.(ii).

113. Tennessee's SIP uses the same thresholds as federal PSD regulations for "significant" net emissions increases in regulated pollutants. *Id.* at 1200-03-09-.01(4)(b)24.; *see* 40 C.F.R. § 51.166(b)(23); *supra* ¶¶ 82–93.

114. Tennessee's SIP requires that new major sources and major modifications to existing major stationary sources comply with preconstruction analysis and emissions limitations requirements, including evaluation and application of BACT limits that reflect the maximum degree of reduction achievable. Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(c)3.; *id.* at 1200-03-09-.01(4)(j)3. (2013).

115. Tennessee's SIP requires the owner or operator of a proposed new major source or major modification to include in its permit application "[a] detailed description as to what system of continuous emission reduction is planned for the source or modification, emission estimates, and any other information necessary to determine that [BACT] would be applied where required[.]" *Id.* at 1200-03-09-.01(4)(e)2.(i)(III).

116. BACT is required at the emissions-unit level for each criteria pollutant subject to PSD. *Id.* at 1200-03-09-.01(4)(j)3. (2013), (b)53.

117. For a major modification, BACT must be applied to every emissions unit undergoing a physical or operational change that results in any net emissions increase of a pollutant subject to PSD. *Id.* at 1200-03-09-.01(4)(j)3. (2013).

118. Facility operators may be required to study and install multiple pollution control technologies to minimize different pollutant emissions from a single unit. *See id.*

119. The proponents of a new major source or major modification in Tennessee must also perform a "source impact analysis" demonstrating the new source or modification "would not cause or contribute to" an exceedance of any NAAQS. *Id.* at 1200-03-09-.01(4)(e)1.(i)–(ii); *see supra* ¶¶ 99–101.

120. The source impact analysis, which typically must involve robust air dispersion modeling, enables the permitting agency to evaluate whether a source's emissions will result in or exacerbate unhealthy air quality. *See* Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(e), (4)(k).

121. The Technical Secretary of Tennessee's Air Pollution Control Board cannot issue a permit for a new major source or major modification if it "would result in a violation of the ambient air quality standards" or "interfere with attainment or maintenance of a national ambient air quality standard in a neighboring state." *Id.* at 1200-03-09-.01(1)(e).

122. Tennessee's SIP requires an assessment of visibility impacts on nearby national parks, wilderness areas, and other Class I areas. *Id.* at 1200-03-09-.01(4)(n). If emissions from a new major source or major modification will cause an "adverse impact" on visibility in any such areas, the project's permit application can be denied. *Id.* at 1200-03-09-.01(4)(n)2.; *see supra* ¶¶ 102–03.

123. Tennessee's SIP requires the same meaningful opportunities for public participation required by the federal PSD regulations, including the opportunity to review and comment on the Technical Secretary's draft permit. Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(l); *see supra* ¶ 105.

124. Tennessee's SIP requires that "[c]onstruction of a new air contaminant source or the modification of an air contaminant source which may result in the discharge of air contaminants must be in accordance with the approved construction permit application[.]" Tenn. Comp. R. & Regs. 1200-03-09-.01(1)(d) (2013).

125. Under Tennessee's SIP, the Technical Secretary's issuance of a construction permit "shall not relieve any owner or operator of the responsibility to comply fully" with all applicable PSD requirements, including the requirement to apply BACT. *Id.* at 1200-03-09-.01(4)(a)5.; *see Nat'l Parks Conservation Ass'n*, 480 F.3d at 418.

126. Tennessee's SIP requirements cannot be circumvented through methods such as "stagger[ing] installation and operation of a facility to avoid coverage by a standard that applies only to operations larger than a specified size." Tenn. Comp. R. & Regs. 1200-03-09-.03(2) (2009).

127. Tennessee's SIP also prohibits the circumvention of PSD review by proposing or accepting enforceable emissions limits to remain below applicable PSD thresholds and subsequently relaxing those limits. *Id.* at 1200-03-09-.01(4)(a)6. This includes, for example, a restriction on hours of operation that reduces a project's net emissions increase(s) to be below the applicable threshold(s) for a major modification but is later removed from the permit. *Id.* In such cases, PSD requirements apply upon relaxation of the limit "as though construction had not yet commenced on the source or modification." *Id.*

128. Tennessee's SIP prohibits any attempts to undergo a sham process in which a permittee constructs or begins to construct a purported minor source or minor modification with

the intent to operate as a major source or major modification. *Id.* at 1200-03-09-.03(2) (2009); *see* 40 C.F.R. § 51.166(r)(2); Requirements for the Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 54 Fed. Reg. 27274, 27280–81 (June 28, 1989).

**C. Citizen Suit Enforcement Provisions**

129. The Clean Air Act's citizen suit provision authorizes "any person" to sue for violations of an "emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1).

130. The Act defines "emission standard or limitation under this chapter" in part as any standard or limitation established "under any applicable State implementation plan approved by [EPA]." *Id.* § 7604(f)(4).

131. An action under 42 U.S.C. § 7604(a)(1) may proceed after a sixty-day notice period, unless EPA or the State "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order" whose violation has been alleged. *Id.* § 7604(b)(1).

132. The Clean Air Act's citizen suit provision also authorizes "any person" to sue "any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under [the PSD Program]." *Id.* § 7604(a)(3).

133. A civil action under 42 U.S.C. § 7604(a)(3), for allegations regarding any person who proposes to construct or constructs a new major source or major modification without a PSD permit, may proceed immediately, without a notice period, and without limitation regarding any civil action commenced by EPA or the State. *See id.* § 7604(b).

134. In a citizen suit filed pursuant to 42 U.S.C. § 7604(a), the federal district court has jurisdiction to enforce emission standards or limitations and apply appropriate civil penalties for each day of violation. *Id.* §§ 7413(e), 7604(a).

135. For each violation established, a penalty of $124,426 per day may be imposed. *Id.* § 7413(b); 40 C.F.R. § 19.4 tbl.1.

## V. FACTUAL BACKGROUND

### A. Defendant TVA is the owner and operator of the Kingston Coal Plant and the Kingston Gas Plant.

136. The Kingston Coal Plant and Gas Plant are located on the 2,254-acre Kingston Reservation in Roane County at 714 Swan Pond Road, Harriman, Tennessee 337748.

137. Upon information and belief, at all times relevant to the violations alleged in this Complaint, TVA was and continues to be the owner of the real property located at 714 Swan Pond Road, Harriman, Tennessee 337748, where the Kingston Coal Plant and Kingston Gas Plant are located.

138. Upon information and belief, at all times relevant to the violations alleged in this Complaint, TVA was and continues to be the owner and operator of the Kingston Coal Plant and the Kingston Gas Plant.

139. The operating permit for the Kingston Coal Plant, Title V Permit No. 572149, issued on January 15, 2018, lists TVA as the sole permittee.

140. The minor New Source Review permit for the Kingston Gas Plant, Permit No. 981915, issued on November 15, 2024, lists TVA as the sole permittee.

### B. TVA decided to retire the aging Kingston Coal Plant by the end of 2027 and received a minor New Source Review permit for construction of the Gas Plant based on that retirement date.

141. In 2021, TVA completed an evaluation of its aging coal fleet. Following that evaluation, TVA staff recommended retiring its entire coal fleet by 2038.

142. TVA's fleetwide evaluation found that the agency's coal fleet was collectively experiencing operational challenges and deteriorating conditions.

143. Due to those challenges with deterioration and performance, TVA concluded that continued operation of its coal plants "may increase environmental, economic, and reliability risks" and that "the aging infrastructure" of the Kingston Coal Plant "exacerbates these risks." Kingston Fossil Plant Retirement Environmental Impact Statement, Record of Decision, 89 Fed. Reg. 24557, 24558 (Apr. 8, 2024).

144. TVA considered the option of continuing to operate the Kingston Coal Plant indefinitely instead of replacing it. TVA determined that "[f]or the existing units to remain operational, additional construction, repairs, and maintenance would be necessary" and that the costs of those necessary activities "could require potentially significant rate increases, which would disproportionately impact low-income Environmental Justice (EJ) populations." *Id.* at 24559.

145. In 2024, TVA formally decided to "retire, decommission, and demolish" all nine coal-fired boilers at the Kingston Coal Plant by the end of 2027 due to "the age, material condition, upgrades required for current or future environmental compliance and investment costs required to ensure reliability." *Id.* at 24559, 24563.

146. TVA decided to construct the Kingston Gas Plant to replace the retiring Coal Plant's generation.

147. The Kingston Gas Plant contains one gas-fired combined-cycle electric generating unit (Source No. 25), one gas-fired auxiliary boiler (Source No. 26), sixteen gas- and oil-fired simple-cycle aeroderivative combustion turbines (Source Nos. 27–42), five gas-fired fuel heaters (Source Nos. 43–47), a diesel-fired emergency generator (Source No. 48), and a diesel-fired emergency fire pump engine (Source No. 49).

148. The Kingston Gas Plant's combined-cycle electric generating unit (Source No. 25) has a heat input capacity of 4,903 MMBtu/hr and consists of one combustion turbine, one heat recovery steam generator, and one duct burner.

149. The Kingston Gas Plant's gas-fired auxiliary boiler (Source No. 26) has a heat input capacity of 75.0 MMBtu/hr and provides supplemental steam for the heat recovery steam generator.

150. Each of the Kingston Gas Plant's sixteen simple-cycle combustion turbines (Source Nos. 27–42) has a heat input capacity between 395 MMBtu/hr (for oil-fired operations) and 517 MMBtu/hr (for gas-fired operations).

151. Each of the Kingston Gas Plant's five gas-fired fuel heaters has a heat input capacity of 9.9 MMBtu/hr.

152. In November 2023, TVA submitted an air permit application to TDEC's Division of Air Pollution Control, seeking authorization to construct the Kingston Gas Plant as a minor modification of the retiring Coal Plant.

153. To support its classification as a minor modification, TVA represented that the Gas Plant's construction and the Coal Plant's retirement constituted a single project and that the Coal Plant's historical emissions could be subtracted from the Gas Plant's emissions to avoid PSD review.

154. TDEC accepted TVA's proposal to treat the Gas Plant's construction as part of the same project as the Coal Plant's retirement (hereafter referred to as the "Kingston Fossil Fuel Project"), allowing TVA to subtract the retiring Coal Plant's baseline emissions from the new Gas Plant's increase in emissions and thus permit the Gas Plant's construction as a minor modification of the Coal Plant.

155. This minor modification classification allowed TVA to bypass PSD review for the entire Kingston Fossil Fuel Project and avoid the heightened air quality protections and public participation requirements associated with major modifications.

156. In December 2023, TVA submitted a revised permit application, which reiterated that TVA planned to retire the Kingston Coal Plant upon completing construction of the Kingston Gas Plant.

157. Shortly after submitting the revised permit application, TVA submitted a letter to TDEC stating that it expected to retire the Kingston Coal Plant by December 31, 2027.

158. TDEC circulated a public notice for TVA's minor New Source Review permit application in March 2024.

159. In October 2024, TVA submitted a second revision of its permit application, which reiterated that it planned to retire the Kingston Coal Plant by the end of 2027.

160. TDEC did not publish public notice of TVA's revised permit application.

161. TDEC did not publish or seek comment on its analysis of TVA's permit application or a draft version of the permit.

162. On November 15, 2024, the Technical Secretary of the Tennessee Air Pollution Control Board issued minor New Source Review Permit No. 981915, authorizing the Kingston Fossil Fuel Project as proposed by TVA. A copy of Permit No. 981915 is attached hereto as **Exhibit B**. *See* **Ex. B**, State of Tenn. Air Pollution Control Bd. Dep't of Env't & Conservation, Permit to Construct / Modify Air Contaminant Source(s) No. 981915 (Nov. 15, 2024).

163. Permit No. 981915 included Condition G18, requiring TVA to cease operating all nine coal-fired boilers upon completion of the shakedown periods for the new turbines (Source Nos. 25 and 27–42), but by December 31, 2027, at the latest.

164. In its minor New Source Review permit applications, TVA claimed that major New Source Review and the related PSD rules in Tennessee's SIP did not apply because the Kingston Gas Plant's increased emissions would be sufficiently offset by the reduction in emissions from the Kingston Coal Plant's retirement such that the net emissions increases would not exceed the legal thresholds for a major modification.

165. The Technical Secretary's issuance of Permit No. 981915 expressly relied on TVA's agreement to permanently retire the Kingston Coal Plant by the end of 2027.

166. In Permit No. 981915's summary report, a copy of which is attached hereto as **Exhibit C**, TDEC explained that the Technical Secretary issued a minor New Source Review permit authorizing construction of the Kingston Gas Plant because "it is a reasonable presumption that a decision to build new gas combustion turbines and decommission existing coal boilers at the same location would be jointly planned activities that are technically and functionally interconnected." *See* **Ex. C** at 7, State of Tenn. Air Pollution Control Bd. Dep't of Env't & Conservation, Construction Permit Summary Report: Permit No. 981915 (Dec. 15, 2025).

167. TDEC also explained that "[b]ecause TVA is decommissioning its coal-fired [units] less than three years after startup of its proposed new gas combustion [units], TDEC presumes that these activities are substantially related and constitute a single project, in reliance on relevant EPA rules." *Id.* at 8.

### C. After promising to retire the Coal Plant in exchange for receiving a minor New Source Review permit to construct the Gas Plant, TVA reversed course.

168. By the spring of 2025, TVA had begun construction of the Kingston Gas Plant pursuant to the minor New Source Review permit, Permit No. 981915. Images of construction captured by satellite and from other sources are compiled and attached hereto as **Exhibit D**. *See* **Ex. D** at 2, Construction Imagery, TVA Kingston Gas Plant (Sep. 2026).



*Figure 1.* ***Ex. D****, Satellite Image of Kingston Gas Plant, Mar. 1, 2025 (Google Earth & Airbus)*

169. On March 13, 2025, the *Knoxville News Sentinel* reported that TVA had begun construction of the Kingston Gas Plant and published two photos depicting the ongoing construction. *See* **Ex. D** at 3.

170. On May 29, 2025, the *Knoxville News Sentinel* reported on the progress of construction at the Kingston Gas Plant and published two photos depicting the construction. A copy of the newspaper article is attached hereto as **Exhibit E**. *See* **Ex. E** at 1–2, Allison Kiehl, *More Energy, Fewer Jobs*, Knoxville News Sentinel, May 29, 2025, at 1A, 9A; **Ex. D** at 4.

171. The *Knoxville News Sentinel* article published May 29, 2025, reported that "it's not out of the question that regulation changes could mean the original plant could continue to operate alongside the gas plant under construction." **Ex. E** at 1.

172. The same *Knoxville News Sentinel* article attributed the following quote to TVA's Kingston Fossil Plant Manager, Jeff Kickert: "My hope is that we do continue to operate [the Coal Plant] and we can get through some of these regulations that are currently closing us down into 2028 . . . . If those get turned around, we could potentially continue to run." **Ex. E** at 2.

173. In July 2025, TVA met with TDEC staff to discuss a potential project involving continued operation of the Kingston Coal Plant alongside the Kingston Gas Plant.

174. In November 2025, TDEC staff documented in an internal email that TVA might operate the Kingston Coal Plant beyond its retirement date.

175. Days before the TVA Board of Directors were scheduled to meet on February 11, 2026, TVA published a supplemental environmental impact statement identifying that the agency's new preferred alternative plan for the Kingston Fossil Fuel Project was to continue operating the Coal Plant beyond 2027 in addition to construction and operation of the new Gas Plant.

176. TVA's February 2026 supplemental environmental impact statement stated that construction of the Kingston Gas Plant was ongoing.

177. On February 11, 2026, the TVA Board of Directors passed a resolution authorizing TVA to continue operating the Coal Plant together with the new Gas Plant, instructing "TVA staff to apply for any permits" needed to operate the Kingston Coal Plant alongside the Kingston Gas Plant, and authorizing the expenditure of fiscal year 2026 funds and the execution of procurement contracts to enable the continued operation of the Coal Plant beyond 2027. A copy of the Board's resolution is attached hereto as **Exhibit F**. *See* **Ex. F** at 2–3, TVA, Board Resolution (Kingston Fossil Plant Continued Operation) (Feb. 11, 2026).

178. After voting to approve the resolution, the TVA Board clarified its decision was to continue operating the Kingston Coal Plant beyond its previously scheduled retirement date. A

transcript of an excerpt of the proceeding is attached hereto as **Exhibit G**. **Ex. G** at 8:4–13, Excerpt from Proceedings Held Feb. 11, 2026. The TVA Board resolution also noted that "TVA staff anticipates filing an application in 2026 for a PSD permit for Kingston." **Ex. F** at 2.

179. To comply with the Board's resolution, TVA identified several life-extending modifications required to continue operating the Kingston Coal Plant beyond its 2027 retirement date and estimated that the modifications would require an expected investment of $636 million.

180. On information and belief, on February 19, 2026, TVA posted a video to its public Instagram account with a caption sharing that TVA had made the decision to continue the Kingston Coal Plant's operations. The video featured TVA's Vice President of Coal Operations stating that TVA intended to run its Kingston and Cumberland coal plants forever with no end date or closure date.

181. On information and belief, the video posted to Instagram on February 19, 2026, has since been deleted from TVA's Instagram account.

182. Satellite images from February 28, July 27, and September 1, 2026, demonstrate that construction on the Kingston Gas Plant continued after the Board resolution was passed on February 11, 2026. *See* **Ex. D** at 5–7.




*Figure 2.* ***Ex. D****, Satellite Image of Kingston Gas Plant, Feb. 28, 2026 (Google Earth & Airbus)*



*Figure 3.* ***Ex. D****, Satellite Image of Kingston Gas Plant, July 27, 2026 (Google Earth & Airbus)*

183. On June 23, 2026, TVA announced on social media that one of the sixteen aeroderivative combustion turbines had been placed on site at the Kingston Reservation.

184. Satellite imagery demonstrates that substantial progress was made on construction of the Kingston Gas Plant during the summer of 2026. *See* **Ex. D** at 7.



*Figure 4.* ***Ex. D****, Satellite Image of Kingston Gas Plant, Sep. 1, 2026 (Planet Labs PBC)*

185. To date, there have been no public hearing or public participation opportunities provided by TDEC on TVA's revised Kingston Fossil Fuel Project involving construction and operation of the Kingston Gas Plant without retiring the Coal Plant.

**D. The Kingston Coal and Gas Plants each have the potential to emit significant amounts of harmful pollutants, the combination of which poses a serious threat to public health.**

186. The Kingston Coal Plant is fossil fuel-fired steam electric plant with a heat input capacity of more than 250 MMBtu/hr, and it has the potential to emit more than 100 tons per year of several pollutants subject to PSD. As a result, the Kingston Coal Plant is an existing major stationary source of air pollution at TVA's Kingston Reservation.

187. In 2025 alone, the Kingston Coal Plant emitted 3,148 short tons of $SO_2$, 1,763 short tons of $NO_X$, and a total of more than 4.6 million short tons of $CO_2e$.

188. The Kingston Coal Plant's $SO_2$ and $NO_X$ emission rates have increased in recent years compared to previous years, which suggests that TVA has not been maintaining and/or optimizing the operation of the plant's pollution controls.

189. According to TDEC's 2022 regional haze plan, emissions from the Kingston Coal Plant impact visibility in the following Class I areas: Joyce Kilmer-Slickrock Wilderness Area, Great Smoky Mountains National Park, Cohutta Wilderness Area, Shining Rock Wilderness Area, Linville Gorge Wilderness Area, Okefenokee Wilderness Area, Wolf Island Wilderness Area, Cape Romain Wilderness Area, St. Marks Wilderness Area, Swanquarter Wilderness Area, James River Face Wilderness Area, Chassahowitzka Wilderness Area, Sipsey Wilderness Area, Bosque del Apache Wilderness Area, Breton Wilderness Area, Otter Creek Wilderness Area, Dolly Sods Wilderness Area, Everglades National Park, Shenandoah National Park, White Mountain Wilderness Area, Theodore Roosevelt National Park, Mammoth Cave National Park, and Brigantine Wilderness Area.

190. According to the National Park Service's comments on TDEC's 2022 regional haze plan, the Kingston Coal Plant is the second-highest-contributing facility in Tennessee to visibility

impairment in the following Class I areas: Great Smoky Mountains National Park, Mammoth Cave National Park, and Shenandoah National Park.

191. In its 2024 application for a minor New Source Review permit for the Kingston Fossil Fuel Project, TVA reported the following baseline actual emissions for the nine coal-fired boilers (Source Nos. 1–9): 1,208 tons per year of $NO_X$; 459 tons per year of CO; 1,622 tons per year of $SO_2$; 163 tons per year of PM; 398 tons per year of total $PM_{10}$; 336 tons per year of total $PM_{2.5}$; 55 tons per year of VOC; 204 tons per year of sulfur trioxide ("$SO_3$") as $H_2SO_4$; and 4,118,683 tons per year of $CO_2e$.

192. In its 2024 application for a minor New Source Review permit for the Kingston Fossil Fuel Project, TVA estimated the following potential emissions for the new units at the Gas Plant (Source Nos. 25–49): 1,172 tons per year of $NO_X$; 392 tons per year of CO; 22 tons per year of $SO_2$; 163 tons per year of PM; 220 tons per year of total $PM_{10}$; 220 tons per year of total $PM_{2.5}$; 91 tons per year of VOC; 0.23 tons per year of $SO_3$ as $H_2SO_4$; and 4,362,492 tons per year of $CO_2e$.

193. In the summary report accompanying minor New Source Review Permit No. 981915, TDEC presented the following potential emissions for the combined-cycle electrical generating unit at the Kingston Gas Plant (Source No. 25): 802.4 tons per year of $NO_X$; 118.6 tons per year of CO; 12.7 tons per year of $SO_2$; 90.5 tons per year of filterable PM; 109.6 tons per year of $PM_{10}$; 109.6 tons per year of $PM_{2.5}$; 42.9 tons per year of VOC; and 2,547,588 tons per year of $CO_2e$.

194. In the summary report accompanying minor New Source Review Permit No. 981915, TDEC presented the following combined potential emissions for the sixteen aeroderivative combustion turbines at the Kingston Gas Plant (Source Nos. 27–42): 354 tons per year of $NO_X$; 244 tons per year of CO; 8.9 tons per year of $SO_2$; 71.1 tons per year of filterable

PM; 106.2 tons per year of $PM_{10}$; 106.2 tons per year of $PM_{2.5}$; 42.5 tons per year of VOC; and 1,807,917 tons per year of $CO_2e$.

195. TVA's emissions estimates and TDEC's emissions summaries demonstrate that if the Kingston Gas Plant is a new stationary source, its potential emissions exceed the thresholds for a major stationary source requiring PSD review for the following pollutants: $NO_X$, CO, filterable PM, $PM_{10}$, $PM_{2.5}$, and $CO_2e$.

196. TVA's emissions estimates and TDEC's emissions summaries demonstrate that if the Kingston Gas Plant is a modification of the Kingston Coal Plant, the Gas Plant's potential emissions exceed the applicable thresholds for a major modification requiring PSD review for the following pollutants: $NO_X$, CO, filterable PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

197. TVA's 2024 emissions estimates assumed the Gas Plant's combined-cycle electrical generating unit (Source No. 25) would operate in simple-cycle or bypass mode for a maximum of 500 hours per year.

198. Minor New Source Review Permit No. 981915 does not include any limit on the number of hours that the Gas Plant's combined-cycle electrical generating unit (Source No. 25) can operate in simple-cycle or bypass mode.

199. When operating in simple-cycle or bypass mode, exhaust from the combustion turbine bypasses the heat recovery steam generator, the selective catalytic reduction system (which reduces $NO_X$ emissions), and possibly the catalytic oxidizer (which reduces CO and VOC emissions).

200. Total emissions from TVA operations at the Kingston Reservation will be far higher with the Coal Plant's continued operation than the representations TVA made in its permit

applications, upon which the issuance of minor New Source Review Permit No. 981915 were based.




*Figure 5. Potential Emissions Changes, TVA Kingston Site (**Ex. A** at 13 fig.2)*

201. The air pollutants subject to PSD that are emitted by the Kingston Coal and Gas Plants have adverse effects on air quality and human health.

202. Exposure to $PM_{2.5}$ can have adverse impacts on the respiratory, cardiovascular, and nervous systems, and can cause cancer and premature death. Adverse health effects have been observed at all studied concentrations of $PM_{2.5}$, even at levels below the applicable NAAQS.

203. Exposure to $PM_{10}$ can have adverse impacts on the respiratory and cardiovascular systems and can cause premature death. Exposure to $PM_{10}$ is particularly harmful for children, older adults, and people with asthma.

204. Exposure to CO can reduce the amount of oxygen in the bloodstream and have adverse impacts on critical tissues and organs, especially the heart. Exposure to CO is particularly harmful for elderly people, fetuses, and people with heart or lung disease, anemia, or diabetes.

205. Exposure to $NO_X$ can exacerbate respiratory diseases, especially asthma, and is particularly harmful for children and older adults. $NO_X$ has effects on cardiovascular, respiratory, reproductive, and nervous systems. $NO_X$ can also react with other compounds to form small particles and contribute to PM pollution.

206. Exposure to $SO_2$ can have adverse impacts on the respiratory system and is particularly harmful for children and people with asthma. $SO_2$ can also react with other compounds to form small particles and contribute to PM pollution.

207. Formaldehyde is one type of VOC that adversely affects human body tissues, irritating the eyes, nose, throat, and skin, and leading to both acute and chronic health effects. Exposure to formaldehyde, among other VOC, is associated with increased incidences of cancer. Children and adolescents have an increased risk of experiencing health hazards from exposure to VOC like formaldehyde, as their respiratory and immune systems are still in development.

208. $NO_X$ and VOC react with heat and sunlight to form ground-level ozone, which causes a variety of adverse health effects, including diminished lung function, airway inflammation, increased risk of respiratory infection, and increased frequency and severity of asthma attacks. Ozone exposure is particularly harmful for children and people with asthma.

209. $NO_x$ and $SO_2$ react with water, oxygen, and other atmospheric chemicals to form sulfuric and nitric acids, which cause acid rain. Acid rain damages aquatic ecosystems by decreasing the pH of water, which threatens aquatic life and can prevent fish eggs from hatching. Acid rain also damages vegetation, including trees and agricultural crops, by stripping nutrients

from foliage and removing minerals and nutrients from soils. Acid rain can also leach metals from the soil, which contributes to groundwater contamination.

210. $NO_x$, $SO_2$, and PM absorb and scatter sunlight across long distances, creating regional haze that impairs visibility. Regional haze detracts from the clarity and color of scenic views in specially designated places such as national parks and wilderness areas.

211. Emission rates for $NO_X$, and possibly CO and VOC, will be higher when the Kingston Gas Plant's combined-cycle electrical generating unit (Source No. 25) operates in simple-cycle or bypass mode because the exhaust bypasses the heat recovery steam generator, the selective catalytic reduction system, and possibly the catalytic oxidizer.

212. Roane County, Tennessee, where the Kingston Coal Plant and Kingston Gas Plant are located, is currently designated as attainment or unclassifiable for all applicable NAAQS for the criteria pollutants emitted by the Plants. 40 C.F.R. § 81.343.

213. There are no active regulatory ambient air monitors for ozone, $NO_X$, $PM_{10}$, CO, or $SO_2$ in Roane County. Two $PM_{10}$ monitors were previously located west of the Kingston Reservation, in Rockwood, Tennessee, but their most recent data collection is from 2016.

214. The closest active regulatory ambient air monitor for ozone is in Loudon, Tennessee (Site ID No. 47-105-0109), more than fifteen miles away from the Kingston Reservation.

215. The closest active regulatory ambient air monitor for nitrogen dioxide, a subset of $NO_X$, is near Happy Valley, Tennessee (Site ID No. 47-009-0101), more than thirty miles away from the Kingston Reservation.

216. The closest active regulatory ambient air monitor for $PM_{10}$ is in Knoxville, Tennessee (Site ID No. 47-093-1013), more than thirty miles away from the Kingston Reservation.

217. The closest active regulatory ambient air monitor for $PM_{2.5}$ is in Harriman, Tennessee (Site ID No. 47-145-0004), approximately three miles from the Kingston Reservation.

218. The closest active regulatory ambient air monitor for CO is in Nashville, Tennessee (Site ID No. 47-037-0040), more than 125 miles away from the Kingston Reservation.

219. The closest active regulatory ambient air monitor for $SO_2$ is near Happy Valley, Tennessee (Site ID No. 47-009-0101), more than thirty miles away from the Kingston Reservation.

**E. The State Determined TVA's Continued Construction of the Kingston Gas Plant Violates the Tennessee SIP.**

220. On August 21, 2026, the Technical Secretary of the Tennessee Air Pollution Control Board issued an administrative Consent Order, agreed to by TVA, related to the violations alleged herein.

221. Section XXXVIII of the administrative Consent Order documents the Technical Secretary's finding that TVA violated Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3 by continuing to construct the Kingston Gas Plant without having first obtained a PSD permit after notifying TDEC of the change in its project.

222. Under Section XL of the administrative Consent Order, TVA agreed to pay a one-time civil penalty to TDEC totaling $202,650 in response to the Technical Secretary's finding that TVA violated Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3.

223. The administrative Consent Order does not prohibit TVA from continuing to construct the Kingston Gas Plant.

224. The administrative Consent Order documents the Technical Secretary's reservation of the right to assess additional civil penalties and damages and to pursue further enforcement action including for monetary and injunctive relief.

225. The administrative Consent Order did not arise from "a civil action in a court of the United States or a State." *See* 42 U.S.C. § 7604(b)(1)(B).

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Construction of the Kingston Gas Plant without a PSD Permit)**

226. The preceding paragraphs are realleged and incorporated herein by reference.

227. At all times relevant to this claim, TVA was and continues to be the owner of the real property located at 714 Swan Pond Road, Harriman, Roane County, Tennessee 337748, where the Kingston Coal Plant and Kingston Gas Plant are located.

228. At all times relevant to this claim, TVA was and continues to be the owner and operator of the Kingston Coal Plant and the owner and intended future operator of the Kingston Gas Plant.

229. In Roane County, Tennessee, review under Tennessee's federally approved PSD regulations is required for each regulated pollutant for which a project at an existing major source will cause a significant net increase in emissions.

230. If the Kingston Gas Plant is a new stationary source, it is a new major stationary source subject to PSD review because it is a fossil fuel-fired steam electric plant with a heat input capacity of more than 250 MMBtu/hr, and its potential emissions exceed 100 tons per year for each of the following pollutants: $NO_X$, CO, filterable PM, $PM_{10}$, $PM_{2.5}$, and $CO_2e$.

231. According to TVA, construction of the Kington Gas Plant is a modification of the Kingston Coal Plant, which is an existing major stationary source for the following pollutants: $NO_X$, CO, $SO_2$, PM, $PM_{10}$, $PM_{2.5}$, VOC, $H_2SO_4$, and $CO_2e$.

232. TVA no longer plans to retire the Kingston Coal Plant by the end of 2027 and instead plans to operate the Kingston Coal and Gas Plants concurrently and indefinitely.

233. When the Kingston Coal Plant's baseline actual emissions are not subtracted from the Kingston Gas Plant's potential emissions, the net increases in the Gas Plant's emissions exceed the applicable significance thresholds for a major modification requiring review under Tennessee's federally approved PSD regulations for $NO_X$, CO, filterable PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

234. If the Kingston Gas Plant is a modification of the Kingston Coal Plant, it constitutes a "major modification" because it results in both a significant emissions increase and a significant net emissions increase of $NO_X$, CO, filterable PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

235. Upon information and belief, TVA began actual construction of the Kingston Gas Plant on or about March 1, 2025.

236. TVA did not apply for a PSD permit for any pollutants prior to beginning construction of the Kingston Gas Plant.

237. TVA did not obtain a PSD permit for any pollutants prior to beginning construction of the Kingston Gas Plant.

238. As of the date of this Complaint, TVA has not applied for or obtained a PSD permit authorizing the construction or operation of the Kingston Gas Plant.

239. Upon information and belief, as of the date of this Complaint, TVA's construction of all new emission units at the Kingston Gas Plant (Source Nos. 25–49) is ongoing.

240. Under the Clean Air Act and the Tennessee SIP, TVA is prohibited from beginning construction of a major modification of an existing major source without obtaining a PSD permit for all regulated pollutants for which the project will cause a significant net emissions increase.

241. Under the Clean Air Act and the Tennessee SIP, TVA is prohibited from beginning construction of a new major source or a major modification of an existing major source before satisfying all applicable PSD requirements, including the performance of preconstruction

monitoring and air dispersion modeling to demonstrate the project will not cause or contribute to air pollution in excess of any NAAQS or otherwise significantly degrade air quality, and the evaluation of emission limits that reflect the maximum degree of reduction achievable for the facility when using modern pollution control technologies and processes.

242. TVA began construction of the Kingston Gas Plant without a PSD permit and without complying with all applicable preconstruction requirements for a new major source or major modification.

243. TVA continued constructing the Kingston Gas Plant, without a PSD permit and without complying with all applicable preconstruction requirements for a new major source or major modification, after publicly abandoning its plan to retire the Kingston Coal Plant.

244. TVA's construction activities at the Kingston Gas Plant violate the Clean Air Act, 42 U.S.C. § 7475(a)(1), and Tennessee's SIP, Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3.

245. TVA's violations of the Clean Air Act, 42 U.S.C. § 7475(a)(1), and Tennessee's SIP, Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3, recur each day that TVA continues construction of new emission units at the Kingston Gas Plant without a PSD permit. *Nat'l Parks Conservation Ass'n*, 480 F.3d at 419.

246. The administrative Consent Order issued by the Technical Secretary of the Tennessee Air Pollution Control Board and agreed to by TVA on August 21, 2026, documents the Technical Secretary's finding that TVA violated Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3 when it continued to construct the Kingston Gas Plant without a PSD permit after notifying TDEC of the change in its project.

247. The administrative Consent Order does not prohibit TVA from continuing to construct the Kingston Gas Plant.

248. The administrative Consent Order did not arise from "a civil action in a court of the United States or a State." 42 U.S.C. § 7604(b)(1)(B).

249. The prohibition on civil actions set forth in 42 U.S.C. § 7604(b)(1)(B) does not apply to claims brought pursuant to 42 U.S.C. § 7604(a)(3).

250. Plaintiffs may commence a civil action against TVA for these unlawful construction activities at the Kingston Gas Plant pursuant to 42 U.S.C. § 7604(a)(1) and (a)(3).

251. Unless restrained by an Order of this Court, these violations and similar violations of Tennessee's SIP will continue.

252. The court has jurisdiction to enforce the Clean Air Act and Tennessee's SIP requirements by granting declaratory and injunctive relief and assessing civil penalties of up to $124,426 per day for each violation. 42 U.S.C. §§ 7413(b), 7604(a); 28 U.S.C. §§ 2201(a), 2202, 1355(a); 40 C.F.R. § 19.4 tbl.1.

## VII. PRAYER FOR RELIEF

Plaintiffs Appalachian Voices and Sierra Club respectfully request that the Court:

(a) declare that TVA has violated and continues to violate the Clean Air Act and the Tennessee SIP;

(b) permanently enjoin TVA from constructing or operating any new emission units at the Kingston Reservation unless and until the Technical Secretary of the Tennessee Air Pollution Control Board issues a PSD permit that authorizes the units' construction and operation;

(c) order TVA to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act and the Tennessee SIP alleged above;

(d) assess a civil penalty against TVA of up to $124,426 per day, per violation;

(e) award Plaintiffs their costs of litigating this action, including reasonable attorney and expert witness fees, pursuant to 42 U.S.C. § 7604(d); and,

(f) grant such other relief as the Court deems just and proper.

DATE: September 24, 2026

Respectfully submitted,

*s/ Delaney King*

Delaney King, TN BPR No. 041512
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
dking@selc.org

*Counsel for Appalachian Voices and Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2026, I electronically filed the foregoing Complaint for Declaratory and Injunctive Relief, with exhibits, with the Court via CM/ECF system, and that pursuant to 42 U.S.C. § 7604(c)(3), Fed. R. Civ. P. 4, and L.R. 4.1, a copy will be served on the following entity via private process server and via U.S. certified mail, return receipt requested:

Mike Skaggs, President & CEO
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902

I further certify a copy of the foregoing Complaint for Declaratory and Injunctive Relief, with exhibits, will be served on the following entities via U.S. certified mail, return receipt requested:

Todd Blanche, Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Francis M. Hamilton III, United States Attorney
Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, TN 37902

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

*s/ Delaney King*
Delaney King

*Counsel for Appalachian Voices and Sierra Club*